at all. Oral argument not to exceed 15 minutes per side. James Tanford, for the appellant, you may proceed. Thank you. May it please the court, we've requested three minutes of our time for rebuttal. Fine. This case, as you know, was remanded for consideration of how the evidence stacks up against the Tennessee Wine Test. That is, whether the predominant effect of Ohio's bans on interstate shipping and transportation of wine is protectionism or the promotion of health and safety. The protectionist effect is obvious and not disputed. They shield local retailers from competition, which the Supreme Court says is the hallmark of economic protectionism. So the question is whether the state has justified the need to discriminate in order to protect health and safety. Tennessee Wine provides three guidelines for making this determination. First, concrete evidence is required, and data, speculation, assertions, arguments, common sense, not enough evidence is required. Second, the evidence must show an actual beneficial effect on health and safety, not just a theoretical one. And three, both sides' evidence is relevant and must be considered. The district court in this case upheld the transportation and shipping bans from a more kind of a global perspective, that they are part of Ohio's three-tier system, and that the three-tier system in general serves public health and safety. The state, in part, makes the same argument. Can I ask you about sort of the three-tier system as it relates to wine is, I mean, are there exceptions to the three-tier system? How does the three-tier system work in this particular case? There are exceptions. The normal three-tier system is, of course, producers sell, the classic one, producers sell to wholesalers, sell to retailers, and retailers sell to consumers. In Ohio, as now in many states, the wine producers are allowed to bypass this system and sell and ship directly to consumers, and this is true in Ohio as well. What about, they can ship to consumers. What about, can wholesalers ship directly to, not wholesalers, but producers ship directly to retailers and sort of skip the wholesaler level? I believe so. And again, that varies state to state. I'm asking specifically about Ohio. In Ohio, can wholesalers sell directly to retailers and bypass the, I'm sorry, can manufacturers sell directly to retailers and bypass the wholesaler tier? I believe so, but I'm not entirely sure. Well, I thought the wholesaler step was integral to the three-tier system because that's where there would be some accountability in terms of regulating prices and compliance with food safety laws and everything else, and that's where the state would be so that the state even maintains some of these wholesaler entities that are doing that, so it seemed like that whole, the entire three-tier system would collapse if you take away the step involving the... Judge Clay, you appear to have frozen on my screen. Oh. There. I'm not sure I heard the end of your question. Well, I don't know how much you heard, but at the very end, it would seem that the entire three-tier system would eviscerate or collapse if you took away the wholesalers as a part of that three-tier system. Ohio has already done that. That is, they allow out-of-state and in-state wine producers to bypass the wholesaler stage and sell directly to consumers, so while... If you don't have the wholesalers, does that mean that the three-tier system, including the wholesalers, was pretty integral to that case and that case applied Tennessee wine? Well, there's a critical difference between this case and the Lebomoff case. Michigan did not have independent wholesalers. The state of Michigan was the importer wholesaler in Michigan, and so it had maintained across the board this control over the distribution of wine. Ohio does not have that system. Ohio as a state is not the wholesaler of wine controlling prices and everything like that. It delegates it all to the private sector and to the extent that it controls prices and things it does through markups, but it already allows out-of-state wineries to bypass these controls. In other words, these controls left are mostly for spirits and hard liquor where it's sort of rigidly controlled and prices are controlled. Does Ohio still purport to utilize the three-tier system, including the wholesalers? Excuse me. I'm sorry. Notwithstanding the remarks you were just making, does Ohio nevertheless still purport to utilize the three-tier system, including wholesalers? It purports to, but the system is optional rather than mandatory in the strict sense of requiring... I mean, it's very convenient for many people, particularly the large producers, to use the three-tier system, use wholesalers, and it makes everything economically efficient. But Ohio doesn't require it, and Michigan did. Michigan, the state, controlled that critical wholesale stage. Here, it does not. It is private companies. But in any event, in Tennessee wine, the Supreme Court said quite clearly that the legitimacy of the three-tier system does not answer the question of whether individual discriminatory features are justified. You can't just say every part of the three-tier system is automatically legitimate. They said that each feature... One of your points, you just said Ohio lets out-of-state wineries bypass the system. They can sell directly to consumers, correct? Correct. Yes, ma'am. And what you want is for out-of-state retailers to be able to sell directly to consumers. But they already can, just in limited quantities. That's the first part of this case. That is, consumers can bring back... That's the transportation limit. That's the transportation. Who can go to another state, buy six bottles of wine, and bring that back. And you want consumers to be able to bring back as much wine as they're allowed to buy in Ohio. Yes, that's... Well, yes. No, the state would be... We say that the current disparity between six bottles and the almost unlimited amount that in-state... 24 cases of 12 bottles, correct, in a year. Yes. And the... We don't have any problem with limitations on shipping quantities. Other states use indirect shipping in order to deal with some of these problems. Some other states use quantities. So we have no problem with them using the same kind of limitation on shipping by retailers that they currently have on shipping from wineries. In other words, we're talking about the same wine. The same wine, if you get it from the winery, you can have it shipped to you in quantities limited only by the same quantity that you can buy in-state. It's the same wine in the same bottle from the same producer. But if it goes through another state's retailer, suddenly you can't do it. And that's the problem, is to justify, for the state to justify the need to prohibit one of three ways that an Ohio resident can get the bottle of wine. So your opponent is going to tell us, I know, based on the brief, that there are health and safety reasons and other important state reasons for these restrictions. What's your response? They have no evidence of it. In other words, what Tennessee Wine says is those other health and safety reasons must be alcohol-related, related to the dangers of alcohol. And those are related to consumption. And the evidence, the actual evidence shows that the 14 states, 12 to 14 states that have been allowing direct shipping from retailers show no greater consumption, any of the consumption-related risks. We introduced data from the National Institute of Health, from the FBI, from the Centers for Disease Control, all do gathering statistics on the health and safety of in-states rated due to alcohol. Well, what about their example of this St. Sadler tainted wine situation? Well, that was, of course, inside the state of Ohio. That was essentially bootlegging. There's always going to be bootlegging in any illegal production, that they didn't correlate any. I mean, if they didn't correlate. So that's an idiosyncratic situation. It's an idiosyncratic. And oddly enough, of course, it was not discovered because of an on-site inspection. It was discovered because somebody reported it. So the whole idea that you need an on-site premise, which the Supreme Court has already said is constitutionally dubious, to conduct these inspections to us is a pretextual argument. They have no hard evidence, no data, no concrete evidence that there is an actual, as opposed to a theoretical, public safety benefit or threat from direct shipping. What about their desire to collect taxes? They already make, when wineries bypass the system and sell directly, they require the wineries to pay the taxes. We all fill out forms and pay taxes. That would work equally well for retailers? Sure. Under a permit, if you ask, it's fairly common to require people shipping. When I have stuff shipped by Amazon, I have to pay state taxes. Out-of-state shippers, under most state laws, are required to pay taxes. Any further questions? Your time is up, so you'll have your rebuttal time. Thank you, Your Honor. Mr. Hendershot? Thank you. Judge Moore, Judge Clay, Judge Mathis, may it please the court. When this panel sent the case back to the district court, it was with very specific instructions to find out whether, in this record, the plaintiffs had put forward, as the panel described it, countervailing evidence that distinguished the record here from the record in Labimoff. The district court looked at the small set of evidence that might be different from that record, concluded that it did not change the nature of entering judgment for the state here, and also went through the state's evidence about inspections, as well as this St. Saddler Wine incident that you asked about, Judge Moore, and concluded that, like every other circuit to look at this, that the state's power under the 21st Amendment allows it to maintain the requirement that there be in-state presence for the wholesalers and the retailers that are part of the alcohol distribution system. Like I say, that put the court in very good company because there's a 7-0 circuit tally on this question, including three circuits just last year, after this panel's remand, that took a look at this case, including cases like the Seventh Circuit and the Third Circuit, that looked at specific evidence that dug into the evidence a little more than some of the earlier cases on this question, and concluded, just like the district court here, that the state's interest justified summary judgment in their favor to uphold these regulations that several dozen states have very similar regulations to Ohio. And maybe one way to explain that unanimous circuit view is to look at the very first post-Granholm case that considered this question. That was the Second Circuit, and Judge Calabrese's concurrence in that judgment noted that what the plaintiffs were asking there, the same thing the plaintiffs have been asking in all of these cases around the country, would be to extend Granholm, and to do so in a way that ignores some of its most specific language. So adding a code to that, Judge Calabrese said, that would be to do something, to ask the circuits to do something that they can't do, that is to get ahead of the Supreme Court. Well, what is the evidence that you rely on to show that the health and safety is so significant, and must be pursued via these two restrictions? Sure. I'd make two points about that, Your Honor. The first is that all the circuits have looked at this, including the concurring opinion in Labamoff, has said that it is baked in, health and safety justifications are, quote, baked into the three-tier system, and its core components like in-state presence. But also, there is plenty of specific evidence here, and I don't think any of this is disputed, but Ohio conducts thousands of inspections of retail locations every year, but it issues citations. But you allow, excuse me, you do allow the wineries to ship directly, correct? That is correct, and that is... Somehow we are talking over each other, I'm sorry. How do you justify treating retailers differently than wineries from out of state? Yeah, several things, Your Honor, and I apologize if the connection here is getting us on top of each other a bit. So the Second, Third, and Fourth Circuit have all looked at the same issue, that there is a limited exception for wineries, and wineries are just not in the same position as retailers. The number of wineries in this country is in the single-digit thousands. The number of retailers is in the hundreds of thousands, or estimates in the record here, 400,000 to 600,000. So the retailers can be a point of entry into the distribution channel here, like this tainted wine incident in Ohio. There's also, if you look at the Seventh and Third Circuit opinions, examples of bootleg products, those can often enter the stream of commerce at the retail level. The wineries, unlike the retailers, have a federal license. They jeopardize that federal license if they ship in violation of state law. So sort of like a death knell to a winery, if it were to get outside of its federal license. Retailers simply are a much more scattered and not federally regulated set of entities, and they're often the entry points. Could you impose the same requirements in order for a retailer to get a permit to ship into Ohio? We don't think so, Your Honor. It'd be a matter of both the human power to inspect all those retailers, the jurisdiction of Ohio to inspect those retailers, and we know from the records here. Do you inspect the wineries that are out of state that you ship in? No, they're not inspections. You do need to secure a permit as an out-of-state or an Ohio permit to ship, and I think the inspection in terms of the sanitation and the security of those premises is something that we do rely on the federal license. And again, the Second, Third, and Fourth Circuit have looked at this exact question and said, yes, so I'm trying to do my best not to step in there. I know, and I understand that we're having the Zoom issue, so I'm not in any way irritated. I'm by raising my hand to show that I wanted to ask you a question. You are saying that these are all important circuits. I would say that in terms of the Fourth Circuit, Judge Wilkinson had rather vigorous dissent, so it's not a unanimous opinion at all, and other circuits are also having dissenting judges, so that we do need to take each of these cases very seriously in terms of what really are the safety concerns. I'm also concerned about the St. Sadler issue because that was, as I understand it, it was someone who was making wine in Ohio who then sold the wine, and somebody, a consumer of the wine, got sick, and it was the consumer that filed the complaint. I wonder why that wouldn't equally be true of wine that's shipped in, that a consumer who makes a complaint can then get action by the state to deal with any tainted wine. Well, Your Honor, I think the key point of that incident is not that the wine was made in Ohio or that it came from a consumer complaint. It was the ability of Ohio's regulators to respond to that incident, and there were 18 distinct retailers that this wine was on the shelves. They were able to enter those premises and remove them in a way they could not do if they were being shipped from out of state. If something entered the stream of commerce in Indiana or in some other state, then there would not be the power of Ohio regulators to deal with it as they did with this incident. The Third Circuit decision talks about this problem, too, with the inability to get New York regulators to help out New Jersey regulators, and so I do want to back up to the point Your Honor made about Judge Wilkinson's opinion. I do think he does kind of stand alone of all the opinions, including the concurrent opinions out there in these seven or eight circuits. If you count Labamoff in this circuit as one of them, that would bring the tally to eight. Can I ask you a question, Counsel? You mentioned earlier, this is going back to something you mentioned earlier about the three-tier system, how health and safety is baked into that sort of system where you have the wholesaler, I mean, you have the producer who has to go through the retailer, then to the consumer. How is that health and safety baked in where there are clear exceptions, meaning the wineries can ship directly to the consumers, the wineries can ship directly to the retailers? How is that health and safety baked into Ohio systems when there are these sort of exceptions? Yeah, Your Honor, I guess I would say the same thing as the second, third, and fourth circuit have about that exception. The winery exception, because of one part of the health and safety, of course, is the product itself. And because the wineries have this extensive federal regulation, that that exception doesn't change the overall funneling. You can think of it as an hourglass. There are many producers, few wholesalers, many retailers, but Ohio having in-state presence control over the wholesalers and retailers for the vast majority of the product allows them to get in front of bootleg situations like the St. Sadler that, of course, didn't involve a winery. It was a warehouse production somewhere in Cleveland. Counselor, you said the vast majority of the product. I mean, are there any limitations on the amount of sort of wine that wineries can ship to consumers under Ohio's law? There is a total case limit that I think was referenced earlier, and it is quite large, so I don't think that's... So in terms of, I guess, the total product, I don't think there's record evidence here about sort of the total amount, but in terms of the number of direct shipments versus how much passes through the wholesalers, still the vast majority of product or types of product passes through that. Now, we've talked a lot about health and safety in terms of bootlegging and entering the stream of commerce there. What we haven't talked about is the other key health and safety provision that is, to use Judge McKeague's words, baked into these kind of rules that Ohio has, and that is the price point of the alcohol. So Ohio has both minimum markups to alcohol as well as taxation that sets a price point that Ohio regulators think is the right balance between consumption and abstinence to avoid the well-acknowledged social ills of alcohol. And that price point is something that Ohio maintains by when they do in-person inspections of retail shelves. If the alcohol is not priced as it is, how does that work vis-a-vis the wineries that are shipping from out of state in? How do you maintain the price point and the minimum markup? The holders of those S-1 and S-2 permits do have to submit, I believe it's quarterly information about their sales. And so those markups are enforceable against them. As far as no one was asked to opine on this, I believe in the record here, but I can tell you by stepping outside the record for a moment that I don't believe there have been problems with the minimum price point from wineries. And again, they have so much at stake, I think, from violating those laws in a way that a retailer in a neighboring state to Ohio just is a low-risk proposition to not comply with Ohio law compared to a winery. Could you not have as part of your permit system a requirement that an out-of-state retailer get a permit and then make showings of maintenance of price points vis-a-vis sales to people in Ohio? I mean, it is possible. I think it points up two problems, Your Honor. One, which issue of standing that we haven't touched on yet. But the other is just the number of retailers we're talking about that would be involved here. And we know from the evidence in this case, if you look at the first powers declaration, for example, that when Ohio did some controlled buys from out-of-state retailers, they shipped without having a license. They shipped by evading the taxes. If you look at the wholesaler's amicus, page 10 and 12, that's on our side of the case here, it mentions the millions of dollars of tax evasion that Texas has experienced. So the problems from the retailers, there is concrete evidence here. There are significant problems with retail shipments that you don't have with the direct winery shipments. I know I've referenced this a couple of times. It's the second, third, and fourth circuit have all looked at that exception and concluded it doesn't detract from the baked-in justifications that go along with this very common set of regulations that Ohio has. And many, many states across the country, the circuits have upheld, whether it's Michigan, Indiana, Arizona, New Jersey, and the list goes on. Now, I did reference a standing issue that I apologize has taken this long to... Before you go to something new, what data do you rely on to arrive at the price point that you think would be effective, other than the general proposition that the higher the price, the less consumption. But if you don't have an empirically established price point with some rationale for it, then it seems like we'd have to deny the whole discussion about this price point issue. But what data are you relying on for that? Sure, Your Honor. The Kerr Report, which is Record 116.1, goes through a number of studies. The proposition that higher price leads to lower consumption, he does discuss that. That's, I think, a fairly straightforward and common-sense proposition. He then details several studies that connect higher consumption with all sorts of the social ills of alcohol, drunk driving incidents, domestic violence, and so forth. So that's where that information is collected in this record, in addition, of course. I'm sorry. So you don't have a definitive study or anything. You're just looking at the whole universe of different studies and essays about this price point issue. Is that it? Well, I think those are the existing literature out there about the... It seems to me a kind of hard proposition to dispute that higher prices lead to less consumption. That's true for almost all products. And then, of course, the connection between higher consumption and all kinds of social ills of alcohol. And I guess beyond the Kerr Report... The point is, though, that you've not selected a price point that you think is supportable that's authoritative for this purpose. You just have general discussions about all these different studies and such. But you don't have anything specific that we're relying on here. Well, I think the Kerr Report is specific. And the price point that Ohio has chosen is distinct, as the Kerr Report also details, is a distinct price point from other states, including some large states like Texas and California, that might be where retailers would send alcohol into the state. I'm somewhat confused about this price point idea. You don't have one price point for all different kinds of wine. You have some wine that's cheap that you can buy in a drugstore for like $3 a bottle in Ohio. And then you have some wine that's middle priced, and some wine that's really expensive. So I don't understand this price point at all. Well, Your Honor, it is true there's not a single price for all wine, of course. It is a threshold that is based on the starting price point. I would say two things, that there's an infamous, very cheap $2 bottle of wine out there. This is not in the record, but it wasn't just cheap in Ohio because of these laws. And if you look at the Stevenson and Jones Report, I think that's pages 54-80, it goes through some examples of how wine would be cheaper in Illinois, which is where the corporate plaintiff here is, than in Ohio. So it is both there. The very lowest floor is different in Ohio, although I don't think there is specific record evidence of that. But when you have minimum markups and taxes that are higher than some neighboring states, then the floor can't go as low as it might go in other states. And that's a point that the Leibomoff Court made as well, that you have this race to the bottom. If you tear down the three-tier system's core component here of an in-state presence and the power to regulate both, of course, to prevent bootlegging, as well as the floor of the price. Can I ask this? How does the three-tier system justify the out-of-state transportation limit? Your Honor, there's definitely not as much in terms of circuit commentary on this. I think the Fourth Circuit's Brooks decision, Judge Niemeyer's opinion there is probably the most extensive discussion. But the basic point is that near unlimited personal transportation just circumvents all the protections of in-presence retail sales, both of the price point and the inspections. Ohio has a lot of communities that are right on the border, whether you have university towns like Oxford, Toledo, and Cincinnati are right against the border. So near unlimited personal transportation dramatically circumvents the retail distribution channel, just like allowing shipment from out of state. How do these arguments relate to the ability to engage in online wine sales? I think that was a big point that Judge McKee got into in his dissent and leave them off. But how does all this relate to online wine sales? Well, I think the point, as I understand Judge McKee's opinion there in that case, is the delivery method. You could think of concentric circles of delivery from, just imagine a storefront in Columbus. There's right there at the counter, there's delivery to the parking lot, delivery with their own employees, or delivery across the state. And so Judge McKee was wondering whether, is all of that part of the kind of traditional in-presence retail sales storefront? And he says, I think, I read him as being in line with Judge Calabresi and saying, that's something the Supreme Court may consider, but the circuits, that's why the circuits are unanimous on this point, in the position they're in, in light of what the Supreme Court has said about the basic structures of this system, that they cannot get in front of the Supreme Court and further shrink the state's 21st Amendment power than what the Supreme Court has already done. Thank you. We've taken well beyond your time, so we appreciate your argument. Thank you. Thank you. Just a couple of things. One is, he keeps talking about things being baked into the three-tier system. Tennessee only dealt with that, and it said that this court's approval of the system as a whole is not enough. That reads too much into our approval. Individual discriminatory features must be justified on their own, with evidence of an actual health and safety effect. The fact that one conducts inspections doesn't mean that they can prove that that has solved a problem or produced a particular result. The on-site inspection argument, in fact, was made quite explicitly in the Granholm case. It was argued extensively by the New York Solicitor General, and the Supreme Court rejected it. They said the on-site argument fails because the Commerce Clause has always said you cannot require someone to become an in-state resident in order to compete. A couple of their other arguments, just to correct one thing on their argument, that the other circuits have been unanimous, they've not been the First Circuit, went a different way. There are several lower court cases, including a recent one out of Maryland and Iowa, that have gone the other way. There's not been one, but there have been several concurrences and dissents in the other circuits, a very strong dissent also in the Ninth Circuit. I agree with him that most of the other appellate cases have upheld these laws, but of course, this is not up to a vote. Each circuit makes their own decision based, as Lebomoff said, as the concurrence in Lebomoff said, on this specific law and this specific argument. One is that they allow unlimited out-of-state wineries to ship. Other states have really limited that. Secondly, they allow people to personally transport it across the border, just limited to six bottles, but they can go back and forth and do six bottles more than once. So, Ohio's argument that somehow an in-state presence and going through an Ohio wholesaler is important just does not hold as much weight as it did in the other states. Finally, they have misstated this four to six hundred thousand out-of-state retailers. The record is quite clear. When you have permits, as opposed to just all the illegal shippers, when you have permits, only approximately 200 interstate online retailers sign up for them, and out-of-state retailers have state permits, just like out-of-state wineries have federal permits. Both are in jeopardy if they violate the law. That's in the record. Illinois will revoke House of Blunts' license if it behaves illegally in Ohio. Ohio has no control over whether either the feds or another state revokes the license, so those are the same. I apologize. I ran over my time. That's okay. We caused everyone to run over, so thank you both for your argument. The case will be submitted and we'll issue a decision in due course.